IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TOMMY J. MAY,

      **Plaintiff,**

      v.                                                   CASE NO. 22-3198-JWL

(FNU) BUNTING, et al.,

      **Defendants.**

## MEMORANDUM AND ORDER TO SHOW CAUSE

Plaintiff Tommy J. May is hereby required to show good cause, in writing to the undersigned, why this action should not be dismissed due to the deficiencies in Plaintiff's Complaint that are discussed herein.

**I. Nature of the Matter before the Court**

Plaintiff, a state prisoner appearing pro se and in forma pauperis, filed this civil rights case under 42 U.S.C. § 1983. Although Plaintiff is currently an inmate at the El Dorado Correctional Facility in El Dorado, Kansas, his claims arose while he was in custody at the Douglas County Detention Center in Lawrence, Kansas ("DCDC"). On October 7, 2022, the Court entered a Memorandum and Order (Doc. 8) ("M&O") finding that Plaintiff's access to the courts claim failed to state a claim and directing officials responsible for the operation of the DCDC to prepare a *Martinez* Report (the "Report") on Plaintiff's claim regarding his medication. The Report was filed on February 6, 2023, and Plaintiff has filed a Response (Doc. 40) to the Report.

Plaintiff alleges in his Complaint that he has stage three multiple myeloma cancer. He was prescribed oxycodone pain medication by the Veterans Administration and the University of

Kansas Medical Center, to relieve the pain caused by a spinal repair incident to the cancer. (Doc. 1, at 3.)  Plaintiff alleges that Dr. Jody Palmer was his oncologist treating his cancer, and he also had a specialist for his heart and one for his pain—Dr. Webster.  *Id*. at 4.

Plaintiff claims that while housed at the DCDC, APRN Melody Stroda showed deliberate indifference to Plaintiff's serious medical need "by blocking [his] cancer specialist from prescribing the proper medication for the great pain that [he] was suffering" and failing to "prescribe anything that was on par with the condition that [he] suffered."  *Id*. at 2.

Plaintiff alleges that his specialists wanted to prescribe oxycodone for Plaintiff, which was previously prescribed for Plaintiff by physicians at the Veteran's Administration and KU Medical Systems.  *Id*. at 4.  Plaintiff alleges that APRN Stroda sent a note with medical transport for the specialists, falsely claiming that the medications on the list are the only ones allowed in the DCDC.  *Id*.  Plaintiff alleges that because of this, and Dr. Palmer desire to not "get into these false politics," Dr. Palmer did not prescribe anything for Plaintiff.  *Id*.

Plaintiff alleges that APRN Stroda prescribed Plaintiff Tylenol #3, despite his pleas for stronger pain medication.  *Id*. at 4, 6.  Plaintiff alleges that he knows that other inmates have been issued oxycodone despite the facility's claim that is it not allowed in the facility.  *Id*. at 7.

Plaintiff alleges that APRN Stroda and Dr. Palmer violated his Eighth Amendment rights by being deliberately indifferent to his medical needs.  *Id*. at 7.  Plaintiff alleges that he filed a grievance with Sheriff Bunting, who told Plaintiff that he was deferring to APRN Stroda.  *Id*. at 9.[1]  Plaintiff names as defendants:  Sheriff Bunting; Nurse Melody Stroda; and Dr. Jody Palmer, Oncologist at Lawrence Memorial Hospital.  Plaintiff seeks compensatory and punitive damages.

---

[1]  Plaintiff also alleges that he was denied court access, but the Court has previously found that Plaintiff failed to state a claim for the denial of court access.  Therefore, the Court will not address Plaintiff's allegations regarding this claim.  *See* Doc. 1, at 9–10; Doc. 5, at n.1; Doc. 8, at 2 ("Plaintiff's general statements fail to state a claim for relief based upon a denial of access to the courts.").

*Id*. at 14.

The Report states that although Plaintiff has been incarcerated in various facilities throughout the State of Kansas as far back as 1984, he was last incarcerated at the DCDC from July 3, 2018, until December 23, 2020, when he was transferred to the El Dorado Correctional Facility. (Doc. 21, at 3; Exhibit 1.) The Report provides in relevant part that:

> During May's incarceration in the DCDC he was seen at least once a month by Dr. Jodi Palmer who is an oncologist at LMH Oncology & Hematology Center in Lawrence, Kansas ["LMH"]. [Exhibit 10, Lyles Declaration, ¶ 8]. The LMH records indicate that May presented for follow up usually each month for multiple myeloma. [Id. at ¶ 5][Exhibit 15, Select Medical Records]. At each visit, his Chief Complaints, diagnostic history, treatment history and systems are reviewed and annotated by the specialist and a form is returned to the medical unit by the transport officer. [Exhibit 10, Lyles Declaration, ¶ 6].
> Melanie Stroda, who was the Site Practitioner providing primary medical care for inmates in the general population, holds an Advanced Practice Registered/RN licensure and was in charge of the overall operation of the medical clinic at the DCDC. [Exhibit 9, Stroda Declaration, ¶ 2]. In that role, Stroda was providing medical care for inmates regarding acute and chronic complaints, reviewed inmate's internal medical records as well as those from outside physicians providing specialty care and, in short, was responsible for May's medical care while in the DCDC. [*Id*].
> While in the DCDC and separate from his treatment for multiple myeloma, May complained of back pain. [*Id.* at ¶ 4]. Stroda made the determination that Tylenol III was the appropriate medication based upon the medical complaints he made. The medication was administered every twelve hours. [Exhibit 9, Stroda Declaration, ¶ 5][Exhibit 10, Lyles Declaration, ¶ 7].
> At some point during 2020, May began seeking opioids for his pain relief. Stroda communicated with Dr. Palmer at LMH who confirmed Stroda's opinion that oxycodone was not appropriate for long-term chronic pain relief and that Palmer was deferring to the DCDC medical staff for May's pain management. Palmer supported the continued administration of Tylenol. [*Id.* at ¶ 6].
> Stroda reviewed May's LMH records after each visit and determined the physicians at LMH performed pain management studies on May with the direction that Tylenol continued to be administered. [*Id.* at ¶ 8]. At no time did Dr. Palmer "prescribe"

>oxycodone for May because, one, she could not prescribe but only recommend and, two, she left the pain management of May up to the medical staff at the DCDC. [*Id.* at ¶ 10].
>	During this time period and in order to address May's complaints of pain, he was referred to both LMH Pain Management and Palliative Care specialists. [Exhibit 10, Lyles Declaration, ¶ 10]. LMH Pain Management recommended and administered two epidural injections which May reported on a pain scale as only 50% effective. Because the Pain Management clinic required a higher effective rate to continue treatment, they did not administer additional shots. Once May learned of this, he told Lyles, in words to the effect "that if I had known it had to be a higher score, I would have said higher." [Exhibit 10, Lyles Declaration, ¶ 11].
>	Separately, the Palliative Care clinic recommended other medications which were approved and ordered for May, but specifically indicated that oxycodone was not appropriate for chronic pain. [Exhibit 10, Lyles Declaration, ¶ 12].

*Id*. at 7–8.

In his response to the Report, Plaintiff reasserts that he was prescribed oxycodone when he was receiving care from the Veterans' Administration. (Doc. 40, at 1–3.) He also claims that he was prescribed oxycodone on an in-patient basis from the Pain Management Specialist, but her attempt to contact the DCDC to come to an understanding about an ongoing prescription was unsuccessful because Nurse Stroda disapproved the prescription. *Id*. at 9–10. Plaintiff also alleges that he began complaining about his pain medication in 2018 and that from July 3, 2018, through October 3, 2020, the grievance form that was used at the DCDC did not allow for medical issues to be grieved by use of the form. *Id*. at 1, 4. Plaintiff also alleges that he has only received copies of Docs. 26 through 34.[2] Plaintiff alleges that the Report fails to address his placement on suicide watch as a result of his pain and his hospitalization for two weeks to receive a pacemaker. *Id*. at 5.

Plaintiff responds to the claim in the Report that oxycodone should not be used for

---

[2]  The Court notes that Plaintiff received a copy of the Report at Doc. 21, as he cites to it in his response. *See* Doc. 40, at 8.  He also cites to Doc. 35. *Id*. at 10.

chronic pain.  He alleges that he had been on oxycodone since 2016, under the care of the KU Medical Center and the Missouri Veterans' Administration.  Plaintiff also alleges that now that he is in KDOC custody, he is housed in the infirmary and currently is being provided with opioids and fentanyl. *Id*. at 11.  Plaintiff claims that although he was told that it was DCDC policy not to allow narcotics, he is aware of an inmate that was allowed to have his mother bring oxycodone to the facility for him.  *Id*. at 12.

## II.  Statutory Screening of Prisoner Complaints

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity. 28 U.S.C. § 1915A(a).  The Court must dismiss a complaint or portion thereof if a plaintiff has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1)–(2).

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988) (citations omitted); *Northington v. Jackson*, 973 F.2d 1518, 1523 (10th Cir. 1992).  A court liberally construes a pro se complaint and applies "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  In addition, the court accepts all well-pleaded allegations in the complaint as true. *Anderson v. Blake*, 469 F.3d 910, 913 (10th Cir. 2006).  On the other hand, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," dismissal is appropriate. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

A pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted). The complaint's "factual allegations must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Id.* at 555, 570.

The Tenth Circuit Court of Appeals has explained "that, to state a claim in federal court, a complaint must explain what each defendant did to [the *pro se* plaintiff]; when the defendant did it; how the defendant's action harmed [the plaintiff]; and, what specific legal right the plaintiff believes the defendant violated." *Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007). The court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citation omitted).

The Tenth Circuit has pointed out that the Supreme Court's decisions in *Twombly* and *Erickson* gave rise to a new standard of review for § 1915(e)(2)(B)(ii) dismissals. *See Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (citations omitted); *see also Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). As a result, courts "look to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief." *Kay*, 500 F.3d at 1218 (citation omitted). Under this new standard, "a plaintiff must 'nudge his claims across the line from conceivable to plausible.'" *Smith*, 561 F.3d at 1098 (citation omitted). "Plausible" in this context does not mean "likely to be true," but rather refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it

innocent," then the plaintiff has not "nudged [his] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Twombly*, 127 S. Ct. at 1974).

## III. DISCUSSION

### 1. Medical Care

The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual punishment. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).[3]

The "deliberate indifference" standard includes both an objective and a subjective component. *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (citation omitted). In the objective analysis, the deprivation must be "sufficiently serious," and the inmate must show the presence of a "serious medical need," that is "a serious illness or injury." *Estelle*, 429 U.S. at 104, 105; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), *Martinez*, 430 F.3d at 1304 (citation omitted). A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez*, 430 F.3d at 1304 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

"The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Id*. (quoting *Sealock*, 218 F.3d at 1209). In measuring a prison official's state of mind, "the official must both be aware of facts from which the

---

[3] It is not clear whether plaintiff was a pretrial detainee or a convicted prisoner at the time of the events described. However, under the Due Process Clause, pretrial detainees are entitled to the same standard of medical care that the Eighth Amendment provides for convicted inmates. *Strain v. Regalado,* 977 F.3d 984, 989 (10th Cir. 2020).

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)).

A mere difference of opinion between the inmate and prison medical personnel regarding diagnosis or reasonable treatment does not constitute cruel and unusual punishment. *See Estelle*, 429 U.S. at 106–07; *see also Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968) (prisoner's right is to medical care—not to type or scope of medical care he desires and difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983).

The October 29, 2020 treating notes from Plaintiff's oncologist, Dr. Palmer, show that she discussed with Plaintiff that "opiates are good for short-term pain but are not particularly effective for long-term pain." (Doc. 35, at 3) (sealed). She also noted that Plaintiff has been on Tylenol 3 for the last two years; he saw pain management yesterday and was offered an epidural but he refused; and she discussed with him that the epidural could be a good option for his lower back pain. *Id*. Plaintiff saw Dr. Patrick Harper for pain management on November 17, 2020, and underwent nerve blocks. *Id*. Plaintiff was seen again by Dr. Harper on November 24, 2020, for additional nerve blocks. *Id*. Plaintiff saw Dr. Palmer again on November 25, 2020, and indicated that the epidural injection improved his pain about 50% and he was happy with the result. *Id*.

Plaintiff's allegations do not show a complete lack of medical care, but rather show Plaintiff's disagreement regarding the proper pain medication. A complaint alleging that plaintiff was not given plaintiff's desired medication, but was instead given other medications, "amounts to merely a disagreement with [the doctor's] medical judgment concerning the most appropriate treatment." *Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010) (noting that plaintiff's allegations indicate not a lack of medical treatment, but a disagreement with the doctor's medical judgment in

treating a condition with a certain medication rather than others); *Hood v. Prisoner Health Servs., Inc.*, 180 F. App'x 21, 25 (10th Cir. 2006) (unpublished) (where appropriate non-narcotic medication was offered as an alternative to the narcotic medication prescribed prior to plaintiff's incarceration, a constitutional violation was not established even though plaintiff disagreed with the treatment decisions made by prison staff); *Carter v. Troutt*, 175 F. App'x 950 (10th Cir. 2006) (unpublished) (finding no Eighth Amendment violation by prison doctor who refused to prescribe a certain pain medication where he prescribed other medications for the inmate who missed follow-up appointment for treatment and refused to be examined unless he was prescribed the pain medication he wanted); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) ("Plaintiff's belief that he needed additional medication, other than that prescribed by the treating physician, as well as his contention that he was denied treatment by a specialist is . . . insufficient to establish a constitutional violation."); *Arriaga v. Roberts,* 803 F. App'x 222, 223 (10th Cir. Apr. 28, 2020) (prisoner's disagreement with medical judgment refusing to provide specific pain medication was insufficient to establish deliberate indifference).

Other courts have found that the refusal to prescribe oxycodone or the discontinuance of a prior prescription of oxycodone does not constitute deliberate indifference, and have noted the dangers in prescribing narcotics in a correctional setting.[4]  In *Malouf v. Turner-Foster*, the doctors decided to taper down and discontinue plaintiff's oxycodone prescription "because such narcotics are typically used for terminal or acute pain, for short term relief, and not for chronic pain." *Malouf v. Turner-Foster*, 2013 WL 209280, at *5–6 (D. N.J. 2013).  The court found no

---

[4] "The danger of prescribing narcotics in a correctional setting is reasonably related to a legitimate governmental interest in maintaining security and safety—a determination 'peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" *Lewis v. King*, 2022 WL 2102091, at *4, n.3 (W.D. Okla. Mar. 10, 2022), *report and recommendation adopted,* 2022 WL 1538651 (W.D. Okla. May 16, 2022) (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 n.23 (1979)).

Eighth Amendment violation, noting that plaintiff was treated for his chronic back pain, and his claims were based on his disagreement with the treatment course set forth by the doctors "who both determined that continued and prolonged use of Oxycodone to manage his chronic back pain was contraindicated, and therefore, prescribed Plaintiff other pain medications more appropriate for management of chronic pain." *Id*. at *6.

In *Thomas v. Wolf*, the court found that "a medical doctor is not required to prescribe stronger pain medication on demand, and the mere fact that Dr. Wolf declined Thomas's requests for drugs more powerful (and potentially more addictive) than ibuprofen is insufficient to establish a culpable state of mind or callous disregard of an 'excessive risk to inmate health or safety.'" *Thomas v. Wolf*, 832 F. App'x 90, 93 (2nd Cir. 2020) (citation omitted).  Likewise, in *Lockett v. Bonson*, the court found that the Nurse Practitioner's decision to prescribe Tylenol #3 instead of oxycodone, which had been prescribed by the non-prison doctor, did not support an Eighth Amendment violation.  *Lockett v. Bonson*, 937 F.3d 1016, 1024–25 (7th Cir. 2019) (noting that the nurse practitioner considered plaintiff's "medical history including his own history of substance abuse, the risks associated with opioid use and substance abuse in prison, and the high amount of oxycodone prescribed"); *see also Kelly v. Ippel*, 2022 WL 500507, at *2 (7th Cir. 2022) ("Although Kelly is dissatisfied with this treatment because it diverged from what his prior doctors did and his medications did not provide complete relief, neither fact is evidence of a constitutional violation. With his chronic conditions, even optimal medical care might not alleviate all pain, and Dr. Ippel and Dawson weighed the risks and benefits of particular pain medications.")

Plaintiff has failed to show that any defendant was deliberately indifferent regarding his pain medication.  Plaintiff's claim suggests negligence, at most, and is subject to dismissal.

### 2. Grievances

Plaintiff fails to state a claim to the extent he takes issue with the grievance form or the responses to his grievances. The Tenth Circuit has held several times that there is no constitutional right to an administrative grievance system. *Gray v. GEO Group, Inc.*, No. 17–6135, 2018 WL 1181098, at *6 (10th Cir. March 6, 2018) (citations omitted); *Von Hallcy v. Clements*, 519 F. App'x 521, 523–24 (10th Cir. 2013); *Boyd v. Werholtz*, 443 F. App'x 331, 332 (10th Cir. 2011); *see also Watson v. Evans*, Case No. 13–cv–3035–EFM, 2014 WL 7246800, at *7 (D. Kan. Dec. 17, 2014) (failure to answer grievances does not violate constitutional rights or prove injury necessary to claim denial of access to courts); *Strope v. Pettis*, No. 03–3383–JAR, 2004 WL 2713084, at *7 (D. Kan. Nov. 23, 2004) (alleged failure to investigate grievances does not amount to a constitutional violation); *Baltoski v. Pretorius*, 291 F. Supp. 2d 807, 811 (N.D. Ind. 2003) (finding that "[t]he right to petition the government for redress of grievances . . . does not guarantee a favorable response, or indeed any response, from state officials"). Any claims regarding the grievance process and the failure to properly respond to grievances are subject to dismissal for failure to state a claim.

### IV. Response Required

Plaintiff is required to show good cause why his Complaint should not be dismissed for the reasons stated herein. Failure to respond by the deadline may result in dismissal of this matter without further notice for failure to state a claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted until **May 12, 2023,** in which to show good cause, in writing to the undersigned, why Plaintiff's Complaint should not be dismissed for the reasons stated herein.

**IT IS SO ORDERED**.

**Dated April 14, 2023, in Kansas City, Kansas.**

           <u>S/ John W. Lungstrum</u>
           JOHN W. LUNGSTRUM
           UNITED STATES DISTRICT JUDGE